Stephen G. Larson (SBN 145225)
*slarson@larsonllp.com*
Jonathan E. Phillips (SBN 233965)
*jphillips@larsonllp.com*
A. Alexander Lowder (SBN 269362)
*alowder@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Plaintiff
ERNEST SIMON, JR.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST SIMON, JR., an Individual,<br><br>        Plaintiff,<br><br>        vs.<br><br>CITY OF LOS ANGELES, MICHEL MOORE, in his individual and official capacity; and DOES 1 through 20, inclusive,<br><br>        Defendants. | Case No.  2:22-cv-1775<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1.      This lawsuit arises from a March 18, 2021 incident in which police officers employed by the Los Angeles Police Department ("LAPD") racially profiled Plaintiff Ernest Simon, Jr., initiated an unwarranted, unjustified, and unlawful "high risk" traffic stop at his place of work—with no reasonable suspicion or probable cause—and then forced him to lie spread eagle on an asphalt lot, at gunpoint, for over 20 minutes despite being unarmed and completely cooperative. The LAPD officers' overwhelming and unjustified show of force against Mr. Simon caused him to legitimately (and understandably) fear that he was going to be shot at his workplace in front of his co-workers for simply being a Black man in the wrong neighborhood.

2.      As alleged herein, Defendants' wanton and reckless disregard of Mr. Simon's constitutional rights violates 42 U.S.C. § 1983 and California law.

3.      Despite investigating its officers' misconduct for a year, the LAPD has failed to take any meaningful action to either hold those officers accountable or to give Mr. Simon even a semblance of justice. Thus, to hold Defendants City of Los Angeles ("City"), LAPD Chief of Police Michael Moore, and Doe Officer Defendants (collectively, "Defendants") accountable for their unlawful actions, Mr. Simon submits the following claims as the first step towards vindicating his constitutional rights.

## JURISDICTION AND VENUE

4.      This case arises under 42 U.S.C. § 1983 and California law. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).

5.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the majority of Defendants reside in, and substantial acts and omissions giving rise to Mr. Simon's claims occurred in, the Central District of California.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Pursuant to California Government Code §§ 810 *et seq.*, Mr. Simon exhausted his administrative remedies by filing a governmental tort claim with the

City on September 16, 2021. By correspondence dated October 19, 2021, the City rejected Mr. Simon's governmental tort claim. Accordingly, Mr. Simon has duly complied with the requirements of the California Government Code by timely filing this Complaint within six months of the City's denial of Mr. Simon's claims.

## THE PARTIES

7.     Plaintiff Ernest Simon, Jr. is a thirty-one year old African American male, residing in Los Angeles, California.

8.     Defendant City of Los Angeles ("City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of the City, and all actions of the LAPD are the legal responsibility of the City. The City is sued in its own right on the basis of its policies, customs, and practices which give rise to Mr. Simon's federal civil rights claims. Pursuant to California Government Code § 815.2(a), the City is further liable for all injuries Mr. Simon suffered as a result of the acts and omissions of the Doe Officer Defendants completed within the course and scope of their employment as police officers for the LAPD.

9.     Defendant LAPD Chief of Police Michel Moore ("Moore") is, and at all relevant times was, the final policymaker for the LAPD, and an employee of the City. At all relevant times herein, Defendant Moore is and was responsible for the promulgation and ratification of all LAPD policies and procedures, and for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all LAPD employees and/or agents. Defendant Moore is sued in both his individual and official capacity.

10.     Defendant Doe Officer 1—whose name and badge number are presently unknown to Mr. Simon—is, and at all relevant times was, employed by the City as a police officer for the LAPD, and was acting under the color of state law

and within the course and scope of his employment at all relevant times alleged herein. Defendant Doe Officer 1 is sued in both his individual and official capacity.

11.     Defendant Doe Officer 2—whose name and badge number are presently unknown to Mr. Simon—is, and at all relevant times was, employed by the City as a police officer for the LAPD, and was acting under the color of state law and within the course and scope of his employment at all relevant times alleged herein. Defendant Doe Officer 2 is sued in both his individual and official capacity.

12.     At all relevant times herein, Defendants Doe Officers 3 through 15, inclusive, together with Defendant Doe Officer 1 and Defendant Doe Officer 2 (collectively, "Doe Officer Defendants"), are or were employed by the City as police officers for the LAPD, and were acting under the color of state law and within the course and scope of their employment. The acts and omissions of Doe Officer Defendants as alleged herein were pursuant to the customs, policies, practices, and procedures of the City and the LAPD. All Doe Officer Defendants are sued in their individual and official capacities.

13.     Defendants Doe Officers 15 through 20, inclusive, are or were employed by the City as supervisory, managerial, and policymaking police officers for the LAPD (the "Supervisor Doe Officers"). At all relevant times herein, Supervisor Doe Officers were acting under the color of state law, within the course and scope of their employment, and pursuant to their supervisory, managerial, and policymaking authority for the City. All Supervisor Doe Officers are sued in their individual and official capacities.

14.     The true names and capacities of defendants sued here as Defendants Doe Officers 1 through 20, inclusive, are unknown to Mr. Simon, who therefore sues such defendants by such fictitious names. Mr. Simon will amend this Complaint to allege their true names and capacities when ascertained.

15.     Each of the Defendants, including Defendants Doe Officers 1 through 20, caused, and are legally responsible for, the incident, unlawful conduct, injuries,

1  and damages alleged by personally participating in the unlawful conduct, or by

2  acting jointly or conspiring with others to act, by authorizing or allowing, explicitly

3  or implicitly, policies, plans, customs, practices, actions, or omissions that led to the

4  unlawful conduct, by failing to take action to prevent the unlawful conduct, by

5  failing or refusing to initiate and maintain adequate training or supervision, and thus

6  constituting deliberate indifference to Mr. Simon's rights, and by ratifying the

7  unlawful conduct that occurred by agents and officers under their direction and

8  control, including failing to take remedial or disciplinary action.

9  **FACTUAL ALLEGATIONS**

10  16.   March 18, 2021 began as a typical work day for Mr. Simon, who was

11  working as a driver the production of the popular television show *Grey's Anatomy*

12  as an employee of The Walt Disney Company's General Entertainment Division

13  ("DGE"). His ordinary work day, however, took a drastic turn after Mr. Simon—a

14  thirty-one year old African American male—was targeted by LAPD police officers

15  who, without any legal justification, initiated a racially motivated "high risk" traffic

16  stop. Multiple LAPD police officers then forced Mr. Simon to lie prone on an

17  asphalt lot at gunpoint for over 20 minutes, using an overwhelming and unjustified

18  show of force against Mr. Simon that caused him to legitimately (and

19  understandably) fear that he was going to be shot at his workplace in front of his co-

20  workers for simply being a Black man in the wrong neighborhood.

21  **LAPD Officers Racially Profile Mr. Simon**

22  17.   On March 18, 2021, the television show *Grey's Anatomy* was being

23  filmed in Tarzana, California, a San Fernando Valley neighborhood located within

24  the City of Los Angeles. According to the *Los Angeles Times*, 70.7% of Tarzana's

25  population is White/Caucasian. By comparison, only 3.6% of Tarzana's population

26  is African American.

27

28

18.     As the "Basecamp" for the show's production, DGE was utilizing an entirely fenced-in playground and parking lot located at nearby Gaspar De Portola Middle School in Tarzana, California.

19.     At all relevant times, the Basecamp was filled with crewmembers working for the production, had visible signage indicating that the fenced-in area was being used by DGE for a television production, and had uniformed security guards guarding the entrance. In addition, production vehicles and trucks used for the production were parked at the Basecamp. Among these production vehicles were a fleet of vans which, on information and belief, were all black Ford Transit vans that DGE had rented and operated for the production.

20.     On March 18, 2021, Mr. Simon's job entailed driving crewmembers and talent between the show's nearby filming location and the Basecamp. On that day, the van Mr. Simon was driving, which was rented and operated by DGE, was a black Ford Transit van with a yellow Apportioned license plate issued by the State of Oregon.

21.     In broad daylight at or around 4:30 p.m., after dropping crewmembers off at the show's set, Mr. Simon was driving back to the Basecamp as he was required to do. Mr. Simon was not speeding. He did not run through a red light or stop sign. Nor did he did not commit any other traffic offenses that would raise suspicion or warrant a traffic stop. As a professional driver for DGE who was operating a vehicle rented by his employer, Mr. Simon was exceedingly cautious in ensuring that he followed all traffic laws.

22.     Still several blocks from the Basecamp, Mr. Simon encountered Doe Officer 1 and Doe Officer 2 at a four-way stop intersection as their squad car approached a stop sign to the left of Mr. Simon's van.

23.     At that time, the front driver's side window of Mr. Simon's van was rolled down, making Mr. Simon clearly visible to Doe Officer 1 and Doe Officer 2. Indeed, Doe Officer 1 and Doe Officer 2 made eye contact with Mr. Simon as his

van was stopped at the stop sign. As such, Doe Officer 1 and Doe Officer 2 clearly observed that Mr. Simon was a tall and heavily built African American male when they first encountered his van at the four-way stop intersection.

24.     Although Mr. Simon had the right of way, he respectfully gestured to Doe Officer 1 and Doe Officer 2 to go through the four-way stop intersection before him. Rather than heeding this polite gesture, Doe Officer 1 and Doe Officer 2 instead waited for Mr. Simon to proceed through the four-way stop intersection. Thereafter, Doe Officer 1 and Doe Officer 2 turned left and began to follow Mr. Simon for several blocks as he drove back to the Basecamp.

25.     During their initial encounter with Mr. Simon, Doe Officer 1 and Doe Officer 2 observed Mr. Simon obey all traffic laws, and there was otherwise no reasonable basis or probable cause to suspect that Mr. Simon had committed or was committing any crime. Despite the absence of any reasonably objective suspicion, Doe Officer 1 and Doe Officer 2 made the decision to follow Mr. Simon after clearly observing Mr. Simon's race and appearance while stopped at the intersection.

26.     Given that there was no reason to suspect Mr. Simon of committing any crime or traffic violation, the decision to pursue Mr. Simon—based solely on the fact that he was an African American male lawfully driving in the predominantly-white neighborhood of Tarzana, California—constitutes racial profiling and discrimination in violation of Mr. Simon's rights under the Equal Protection Clause of the Fourteenth Amendment and California law. *See* Cal. Penal Code § 13519.4.

27.     The LAPD has a long and notorious history of racial discrimination against African Americans like Mr. Simon. To illustrate, based on data collected by the LAPD as required under California's Racial and Identity Profiling Act, African Americans citizens are four times more likely than Caucasian citizens to be stopped by LAPD police officers.

28.     For decades, the City has been on notice of the LAPD's pattern and practice of racial profiling, illegal detentions of Black citizens, excessive force against Black citizens, and illegal searches of vehicles operated by Black citizens.

29.     Despite this notice, the City has demonstrated deliberate indifference to this pattern and practice of constitutional violations by failing to take necessary, appropriate, or adequate measures to prevent the continued perpetuation of racial discrimination against African Americans. This lack of an adequate supervisory response by the City demonstrates the existence of an informal custom or policy that tolerates and promotes the continued use of racial profiling, illegal searches and seizures, excessive force, and violations of civil rights of African American citizens.

30.     On information and belief, Doe Officer 1 and Doe Officer 2 were not subject to any disciplinary action as a result of their discrimination and racial profiling of Mr. Simon. Despite the clear directive against racial profiling by California law enforcement, the LAPD continues to foster a culture and custom of unaccountability and abuse, which not only deprived Mr. Simon of his rights to equal protection, but also served as a catalyst for further violations of Mr. Simon's constitutional rights as alleged herein against a law abiding Black man who was simply doing his job.

**The LAPD Officers Unlawfully Initiate a "High Risk" Traffic Stop Against Mr. Simon Without Reasonable Suspicion or Probable Cause**

31.     After Mr. Simon crossed through the four-way stop intersection and proceeded to drive toward Basecamp, Doe Officer 1 and Doe Officer 2, clearly observing Mr. Simon's race and appearance, changed their course of direction in order to follow Mr. Simon. While Doe Officer 1 and Doe Officer 2 followed Mr. Simon, Mr. Simon continued to obey all traffic laws. Indeed, because Mr. Simon observed the LAPD squad car turn to follow him, and because he was aware of the LAPD's reputation and history of racial profiling, he was even more careful to obey all traffic laws.

LARSON
LOS ANGELES

32.     According to the LAPD, while following Mr. Simon's black Ford Transit van, the automated license plate reader ("ALPR") affixed to Doe Officer 1 and Doe Officer 2's squad car erroneously alerted them that the van's license plate matched a BMW sedan that had been reported stolen. On information and belief, Doe Officer 1 and Doe Officer 2 made no efforts to verify the ALPR system's reading.

33.     Instead, choosing to ignore the obvious fact that Mr. Simon was not driving a BMW sedan as reported by the ALPR system, Doe Officer 1 and Doe Officer 2, without any reasonable suspicion, and without any probable cause to believe that Mr. Simon was involved in any criminal activity, let alone criminal activity posing any high risk of danger, decided to initiate a dangerous "high risk" traffic stop against Mr. Simon after he pulled the van into the Basecamp.

34.     Before entering the Basecamp to do so, Doe Officer 1 and Doe Officer 2 were provided information that wholly negated the erroneous ALPR reading. First, it was obvious to anyone that the fenced-in playground and parking lot was being used for a film or television production—there were signs indicating as such, numerous crewmembers, security, and production vehicles, including other black Ford Transit vans identical to the one being driven by Mr. Simon.

35.     Moreover, at the entrance of the Basecamp, Doe Officer 1 and Doe Officer 2 encountered a security officer hired by DGE that was monitoring the entrance. On information and belief, the DGE security guard advised them that Mr. Simon was a DGE crewmember who was authorized and expected to be at the Basecamp.

36.     Accordingly, just as there was no lawful justification to pursue Mr. Simon in the first instance, there was likewise no reasonable suspicion or probable cause to justify the initiation of a "high risk" traffic stop against Mr. Simon.

37.     It is well-documented that the LAPD has a history of failing to implement statutorily required law enforcement policies and practices regarding the

use of ALPR systems. In February 2020, the California State Auditor published its audit report entitled, *Automated License Plate Readers: To Better Protect Individuals' Privacy, Law Enforcement Must Increase Its Safeguards Over the Data It Collects*, wherein the State Auditor found that "Los Angeles is the only one of four agencies … audited that did not have the ALPR policy state law requires," that "Los Angeles was the most lax in its approach to authorizing [ALPR] user accounts," and that "Los Angeles has not required training before users can access the ALPR system."

38.    The LAPD's failure to adopt, implement, and adequately train police officers on the required policies and procedures for using an APLR system directly caused the deprivation of Mr. Simon's constitutional rights under the Fourth and Fourteenth Amendments as alleged herein.

39.    Doe Officer 1 and Doe Officer 2—ignoring the security guard's explanation and the other readily observable facts that the Basecamp was being used for a television production—entered the Basecamp and approached Mr. Simon with their guns drawn as Mr. Simon sat in the driver's seat of the parked van.

40.    Other than their implicit bias against Mr. Simon's race and appearance, there was no reason for Doe Officer 1 or Doe Officer 2 to believe that Mr. Simon posed any threat. As such, there was no reason for them to draw their firearms in the first instance or use any of the highly intrusive tactics associated with a "high risk" traffic stop against Mr. Simon.

41.    It is clearly established that Ninth Circuit law limits the use of "high risk" stops only to stops that involve the following "special" circumstances: (i) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (ii) where the police have information that the suspect is currently armed; (iii) where the stop closely follows a violent crime; and (iv) where the police have information that a crime that may involve violence is

1    about to occur. *See Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1047 (9th

2    Cir. 2014).

3           42.    Consistent with Ninth Circuit law, the LAPD's Manual makes clear

4    that "officers must not conduct a high-risk felony traffic stop or initiate a pursuit

5    based solely on a [Vehicle License & Title (VLT) Stop] unless additional

6    circumstances justify a high-risk stop or pursuit." *See* LAPD Manual, Volume 4,

7    Section 220.60.

8           43.    No such "special" or "additional" circumstances were present on March

9    18, 2021 to justify a "high risk" traffic stop against Mr. Simon.

10          44.     At all times, Mr. Simon was respectful and fully cooperative with the

11   LAPD officers. In response to their baseless and unjustified assertions that the van

12   was a stolen vehicle, Mr. Simon calmly attempted to explain that he was a

13   crewmember for the production and that the van was rented by DGE for the

14   production.

15          45.    Disregarding Mr. Simon's explanation and without any lawful

16   justification, Doe Officer 1 and Doe Officer 2 forcibly removed Mr. Simon at

17   gunpoint from his employer's van and ordered him to lay face down and spread

18   eagle on the hot asphalt of the Basecamp in front of all of his co-workers.

19          46.    Then, further increasing the intrusiveness of the unwarranted stop, Doe

20   Officer 1 and Doe Officer 2 called for additional LAPD officers to provide support,

21   even though Mr. Simon did not pose any threat and had remained fully cooperative.

22          47.    Thereafter, at least seven speeding LAPD squad cars drove into the

23   Basecamp, and those LAPD officers responded to the scene by drawing their guns

24   and pointing them at Mr. Simon as he continued to lay face down on the asphalt.

25   They also requested that a LAPD helicopter report to the scene. This response

26   constitutes an overwhelming and unnecessary show of force.

27          48.    At all times, there was nothing to suggest to the Doe Officer

28   Defendants that Mr. Simon—who remained fully cooperative and did not resist the

LARSON
LOS ANGELES

officers throughout the entire incident—was either armed or dangerous. Moreover, the "high risk" traffic stop occurred inside Basecamp (i.e., a fenced-in playground) filled with Mr. Simon's co-workers, thereby negating any possibility of flight. Furthermore, the stop did not occur following a crime, and the Doe Officer Defendants had no information whatsoever to support a reasonable belief that Mr. Simon was about to commit a crime of violence.

49.     To the contrary, all the objective facts available to the Doe Officer Defendants refuted any reasonable suspicion or probable cause that Mr. Simon had committed any crime or was in the process of committing a crime, much less a crime of violence.

50.     Nonetheless, the Doe Officer Defendants continued to treat Mr. Simon in an overly hostile and extraordinarily dangerous manner despite pleas from several DGE crewmembers that Mr. Simon was an employee, that the van had been rented by DGE, and that Mr. Simon and the van were where they were supposed to be. Instead of heeding those pleas, Doe Officer Defendants yelled at the crewmembers to "get out of the line of fire," which only increased Mr. Simon's legitimate fear for his life as he lay surrounded by at least eight LAPD officers pointing their guns in his direction.

51.     The LAPD's Manual states: "Unnecessarily or prematurely drawing or exhibiting a firearm … creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of a firearm. An officer's decision to draw or exhibit a firearm should be based on the tactical situation and the officer's reasonable belief there is a substantial risk that the situation may escalate to the point where deadly force may be justified. When an officer has determined that the use of deadly force is not necessary, the officer shall, as soon as practicable, secure or holster the firearm." *See* LAPD Manual, Volume 1, Section 556.80.

52.     The only conceivable reason that Doe Officer Defendants had to draw their firearms was based on their racial profiling of Mr. Simon. Given that Mr.

Simon was unarmed and fully cooperative, there simply were no facts to support a reasonable belief that deadly force may be justified.

53.     Furthermore, because the entire incident took place in a fenced-in middle school parking lot located in a residential neighborhood and with numerous other DGE crewmembers in close proximity, the pure recklessness of Doe Officer Defendants in drawing their firearms while inside the Basecamp not only placed Mr. Simon in fear for his life, but also created the dangerous possibility of an accidental discharge that could injure DGE's other crewmembers.

54.     By yelling at the crewmembers to "get out of the line of fire," Doe Officer Defendants effectively acknowledged that this was a possibility, but still continued to hold a defenseless Mr. Simon at gunpoint for over twenty minutes while he laid face down and spread-eagle on the hot asphalt inside the Basecamp with a LAPD helicopter hovering loudly overhead.

55.     Meanwhile, as Mr. Simon was still lying face down on the asphalt, Doe Officer Defendants, without any lawful basis, searched the van—rented and operated by DGE—that Mr. Simon had been driving. Doe Officer Defendants found nothing in the van to create any reasonable suspicion or probable cause that Mr. Simon was involved in any criminal activity. Yet, the Doe Officer Defendants continued to detain Mr. Simon without any reasonable suspicion or probable cause based solely on his race and physical appearance.

56.     In an effort to defuse the situation, a co-worker of Mr. Simon—another African American male—approached the Doe Officer Defendants to again explain that Mr. Simon was a DGE employee and that the van was operated by DGE.

57.     Just as they refused to listen to Mr. Simon, the Doe Officer Defendants refused to believe Mr. Simon's African American co-worker, whose explanation corroborated both the security guard and Mr. Simon's statements that Mr. Simon was a DGE crewmember who was hired to drive the rented black Ford Transit van for the television production. This refusal to accept the explanation of Mr. Simon's

1  African American co-worker further highlights the racial discrimination by Doe

2  Officer Defendants against African Americans and Mr. Simon.

3  **The LAPD's Prolonged Detention of Mr. Simon Constituted a Racially**

4  **Motivated _De Facto_ Arrest Without Probable Cause**

5       58.    After forcing Mr. Simon to lie spread eagle on the asphalt for

6  approximately 20 minutes, Doe Officer Defendants approached Mr. Simon—still

7  holding him at gunpoint—to place him in handcuffs. Irrespective of the fact that Mr.

8  Simon had shown no signs of resistance, Mr. Simon was unnecessarily double

9  handcuffed.

10       59.    Thereafter, Doe Officer Defendants—in clear view of all of Mr.

11  Simon's co-workers—then forcibly removed Mr. Simon from the ground and

12  ordered him to stand pressed against a LAPD squad car while double handcuffed

13  and surrounded by at least six armed LAPD officers, thereby unlawfully prolonging

14  Mr. Simon's detention.

15       60.    The Doe Officer Defendants' unjustified hostility and mistreatment of

16  Mr. Simon only ended approximately ten minutes later when another co-worker of

17  Mr. Simon, this time a white male, spoke to Doe Officer Defendants and reiterated

18  what the security guard, Mr. Simon, and Mr. Simon's African American co-worker

19  had previously told them: that the van was rented and operated by DGE and that Mr.

20  Simon was a DGE employee who was authorized to be inside the Basecamp. Only

21  after listening to Mr. Simon's white co-worker did Doe Officer Defendants finally

22  release Mr. Simon from custody.

23       61.    Given that the Doe Officer Defendants received the same information

24  three times before Mr. Simon's white co-worker spoke to them, Doe Officer

25  Defendants had a reasonable opportunity to prevent the violation of Mr. Simon's

26  constitutional rights had they been so inclined. However, motivated by racial animus

27  and their implicit bias, Doe Officer Defendants intentionally, with malice and

28  reckless indifference to Mr. Simon's rights, failed to do so.

LARSON
LOS ANGELES

62.     Given the amount of time Mr. Simon was unlawfully detained and the highly intrusive nature of his detention, the Doe Officer Defendants' initial investigatory stop turned into a *de facto* arrest.

63.     By arresting Mr. Simon without a warrant or probable cause, the Doe Officer Defendants deprived Mr. Simon of his rights under the Fourth and Fourteenth Amendments.

64.     As a direct and proximate cause of the Doe Officer Defendants' violations of Mr. Simon's constitutional rights, Mr. Simon suffered, and continues to suffer, injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

65.     On information and belief, Mr. Simon alleges that the violations of his constitutional rights alleged herein were caused by customs, policies, and/or practices of authorized policymakers of the City, including Defendant Moore and other supervisory officials of the LAPD, which encouraged, authorized, directed, condoned, and/or ratified the unconstitutional and unlawful conduct committed against Mr. Simon by Doe Officer Defendants.

66.     The objectively unreasonable acts and omissions of the Doe Officer Defendants—which were all willful, wanton, malicious, and done with reckless disregard for Mr. Simon's civil rights—were, on information and belief, completed pursuant to the customs, policies, practices, and procedures of the City and LAPD.

## FIRST CAUSE OF ACTION

### Unreasonable Search and Seizure – 42 U.S.C. § 1983

### Against Doe Officer Defendants

67.     Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 65 of this Complaint as though fully set forth herein.

68.     The Fourth Amendment to the United States Constitution, incorporated and made applicable to the states and their local governments by the Fourteenth Amendment, guarantees all persons the right to be free from unreasonable searches and seizures.

69.     Doe Officer Defendants, all state actors acting under the color of state law, deprived Mr. Simon of his constitutional rights under the Fourth Amendment by unlawfully seizing Mr. Simon when they initiated a "high risk" traffic stop against Mr. Simon without any lawful basis, reasonable suspicion, probable cause, warrant, or any exception thereto.

70.     Doe Officer Defendants, acting under the color of state law, further violated Mr. Simon's constitutional rights under the Fourth Amendment by unlawfully searching Mr. Simon and the production van rented and operated by DGE without a warrant, exigency, emergency, probable cause, or consent.

71.     As a direct and proximate cause of the Doe Officer Defendants' violations of Mr. Simon's constitutional rights, Mr. Simon suffered, and continues to suffer, injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

72.     The Doe Officer Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Simon's civil rights, therefore warranting the imposition of exemplary and punitive damages.

## SECOND CAUSE OF ACTION

### *De Facto* Arrest Without Probable Cause – 42 U.S.C. § 1983

### Against Doe Officer Defendants

73.     Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 71 of this Complaint as though fully set forth herein.

74.     The Fourth Amendment to the United States Constitution's prohibition against unreasonable seizures extends to detentions unsupported by probable cause when an investigatory stop has risen to the level of an arrest.

75.     Doe Officer Defendants, all state actors acting under the color of state law, deprived Mr. Simon of his constitutional rights under the Fourth Amendment by subjecting him to a *de facto* arrest without a warrant or probable cause.

76.     As a direct and proximate cause of the Doe Officer Defendants' violations of Mr. Simon's constitutional rights, Mr. Simon suffered, and continues to suffer, injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

77.     The Doe Officer Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Simon's civil rights, therefore warranting the imposition of exemplary and punitive damages.

## THIRD CAUSE OF ACTION

### Racial Profiling – 42 U.S.C. § 1983

### Against Doe Officer Defendants

78.     Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 76 of this Complaint as though fully set forth herein.

79.     Doe Officer Defendants, all state actors acting under the color of state law, deprived Mr. Simon of his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment by racially profiling Mr. Simon, who Doe Officer Defendants clearly observed to be a tall and heavily built Black man when they first encountered him at the four-way stop intersection.

80.     Solely motivated by the fact that Mr. Simon was an African American male driving in a predominantly white neighborhood, Doe Officer Defendants

effectuated a racially-motivated "high risk" traffic stop against Mr. Simon without any lawful justification whatsoever.

81.     Without reasonable suspicion or probable cause, Doe Officer Defendants forced a fully cooperative and unarmed Mr. Simon to lay face down and spread eagle on the hot asphalt inside the fenced-in Basecamp needlessly surrounded by LAPD officers who were all pointing guns in his direction as a LAPD helicopter hovered loudly overhead for over twenty minutes. Thereafter, Mr. Simon was double handcuffed, forcibly removed from the ground, and ordered to stand pressed against a LAPD squad car still surrounded by armed LAPD officers.

82.     Mr. Simon did nothing to justify pursuing, stopping, seizing, searching, or arresting him. Nor did Mr. Simon do anything to create a reasonable belief on the part of Doe Officer Defendants that the incident would require the use of deadly force. As such, the Doe Officer Defendants had no basis other than their racial profiling of Mr. Simon as a Black man in a white neighborhood to justify their actions. Notably, this is consistent with the LAPD's pattern and practice of stopping African American citizens four times more often than Caucasian citizens.

83.     Just as they refused to listen to Mr. Simon, Doe Officer Defendants also refused to listen to the corroborative explanations of Mr. Simon's African American co-worker who tried—for the third time—to explain that the van Mr. Simon was driving was rented and operated by DGE and that Mr. Simon, employed by DGE as a driver, was authorized and expected to be at the Basecamp in his capacity as a DGE crewmember. It was only when a white DGE crewmember explained the same thing to Doe Officer Defendants, Mr. Simon was finally released from custody.

84.     As a direct and proximate cause of the Doe Officer Defendants' intentional misconduct, Mr. Simon suffered, and continues to suffer, injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological

treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

85.     To be clear, the harm Mr. Simon suffered as a result of the Doe Officer Defendants' discrimination and racial profiling is considerable and ongoing. Mr. Simon's job continues to entail a significant amount of driving, and the wrongful conduct described herein all occurred while he was at work simply doing his job. As a direct result of the Doe Officer Defendants' racial profiling, Mr. Simon is now terrified to do his job, reasonably fearing the possibility that he could again be subjected to the same, if not worse, excessive force if another ALPR system camera affixed to a LAPD patrol car again erroneously captured the license plate of his company's vehicle and flagged it as stolen. Mr. Simon is also justifiably fearful any time he encounters law enforcement officers, knowing that although he is doing nothing wrong, he could still be subjected to another life-threatening experience simply because of his race.

86.     The Doe Officer Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Simon's civil rights, therefore warranting the imposition of exemplary and punitive damages.

## FOURTH CAUSE OF ACTION

### Excessive Force – 42 U.S.C. § 1983

### Against Doe Officer Defendants

87.     Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 85 of this Complaint as though fully set forth herein.

88.     The Fourth Amendment of the United States Constitution, as applied to the Doe Officer Defendants, provides the right of every person to be free from the use of excessive force by police officers.

89.     Throughout this incident, Mr. Simon presented no immediate threat to the safety of any Doe Officer Defendants or others, including no immediate threat of death or serious bodily injury to any officer or other person. Nor did Mr. Simon act

in any manner that would reasonably suggest that Mr. Simon was attempting, willing, or intending to inflict harm on anyone. To the contrary, Mr. Simon was at his workplace when the incident occurred and he fully cooperated and complied with the Doe Officer Defendants throughout his ordeal.

90.    Nevertheless, based solely on Mr. Simon's race and appearance, Doe Officer Defendants, all state actors acting under the color of state law, violated Mr. Simon's right to be free from the unreasonable and excessive use of force as guaranteed by the Fourth and Fourteenth Amendments.

91.    As a direct and proximate cause of the Doe Officer Defendants' violations of Mr. Simon's constitutional rights, Mr. Simon suffered, and continues to suffer, injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

92.    The Doe Officer Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Simon's civil rights, therefore warranting the imposition of exemplary and punitive damages.

### FIFTH CAUSE OF ACTION

### Supervisory Liability – 42 U.S.C. § 1983

### Against Defendant Moore and Supervisor Doe Defendants

93.    Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 91 of this Complaint as though fully set forth herein.

94.    At all material times, Defendant Moore and Supervisor Doe Defendants had the duty and responsibility to properly hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the Doe Officer Defendants, as well as all other employees and agents of the LAPD.

95.    Defendant Moore and Supervisor Doe Defendants, acting under the color of state law, failed to properly hire, train, instruct, monitor, supervise,

evaluate, investigate, and discipline employees of the LAPD, including Doe Officer Defendants, with deliberate indifference to Mr. Simon's constitutional rights.

96.     On information and belief, Defendant Moore approved, tolerated, and ratified the unconstitutional actions and/or omissions of Doe Officer Defendants and other LAPD police officers by continuing to endorse and/or failing to properly train, instruct, and/or discipline LAPD police officers who initiate "high risk" traffic stops without lawful justification and in contravention of clearly established Ninth Circuit law.

97.     Defendant Moore was aware that his subordinates were engaging in a pattern and practice of unlawfully initiating "high risk" traffic stops against citizens. *See, e.g., Sheilanee Sen et. al. v. City of Los Angeles et al.*, Case No. 2:21-CV-02326 (C.D. Cal. 2021); *Hasmik Jasmine Chinaryan et. al. v. City of Los Angeles et. al.*, Case No. 2:19-CV-09302 (C.D. Cal. 2019); *Theney v. City of Los Angeles*, Case No. 2:15-CV-09602 (C.D. Cal. 2017). Notwithstanding this knowledge, Defendant Moore, acting with deliberate indifference to constitutional rights guaranteed under the Fourth and Fourteenth Amendments, continued to approve and/or ratify the conduct of Doe Officer Defendants by permitting his subordinates to unlawfully initiate "high risk" traffic stops against citizens.

98.     Disregarding the consequences of the LAPD's known or obvious training deficiencies concerning the proper circumstances that must be present before initiating a "high risk" traffic stop, and by failing to institute new procedures and policies within the City, Defendant Moore failed to prevent the unconstitutional acts and omissions of the Doe Officer Defendants and failed to properly supervise such individuals, with deliberate indifference to Mr. Simon's constitutional rights.

99.     Separately, Supervisor Doe Defendants permitted and failed to prevent the unconstitutional acts of Doe Officer Defendants by authorizing the dispatch of a LAPD helicopter to the Basecamp. On information and belief, a supervising LAPD

officer must authorize and approve a request for the use of a LAPD helicopter before the LAPD air-unit can be dispatched to the scene.

100.   On information and belief, Supervisor Doe Defendants failed to properly insure and investigate that the "high risk" traffic stop initiated by Doe Officer Defendants against Mr. Simon was lawful before approving the dispatch of a LAPD helicopter to the Basecamp on March 18, 2021. In doing so, Supervisor Defendants acted with deliberate indifference and reckless disregard for Mr. Simon's rights.

101.   The supervisory conduct of Defendant Moore and the Supervisor Doe Defendants as described herein constituted deliberate indifference to the deprivations of Mr. Simon's rights and was so closely related to the deprivation of Mr. Simon's rights as to be the moving force that caused the ultimate injury.

102.   As a legal and proximate result of Defendant Moore and the Supervisor Doe Defendants' supervisorial conduct, Mr. Simon's rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated, causing Mr. Simon to suffer injury and harm, including lost income, lost business opportunities and related opportunity costs, loss of reputation, emotional distress and physical health consequences, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proven at trial.

103.   Defendant Moore and the Supervisor Doe Defendants' supervisorial conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Simon's civil rights, therefore warranting the imposition of exemplary and punitive damages.

### SIXTH CAUSE OF ACTION

### *Monell* Liability – Unconstitutional Custom, Practice, or Policy

### Against Defendant City

104.   Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 102 of this Complaint as though fully set forth herein.

105.   Doe Officer Defendants, all state actors acting under the color of state law, violated Mr. Simon's constitutional rights under the Fourth and Fourteenth Amendments as alleged herein.

106.   The City and the LAPD had in place official, widespread, and/or longstanding policies, practices, and/or customs that amounted to deliberate indifference to Mr. Simon's constitutional rights under the Fourth and Fourteenth Amendments. These policies, practices, and/or customs were a moving force behind the Doe Officer Defendants' unlawful actions. Specifically, the City maintained or permitted policies, practices, and/or customs that included, but was not limited to, the following:

      a.   Permitting, condoning, and/or ratifying LAPD officers to initiate a "high risk" traffic stops based solely on erroneous ALPR system readings, in contravention of clearly established Ninth Circuit law;

      b.   Permitting, condoning, and/or ratifying LAPD officers to engage in racial profiling against African American citizens and to rely on such racial profiling as the basis for initiating "high risk" traffic stops without reasonable suspicion or probable cause;

      c.   Permitting, condoning, and/or ratifying LAPD officers to engage in uses of force, including the pointing of firearms at people not reasonably suspected to be armed and dangerous.

107.   As a direct and proximate result of the City's policies, practices, and/or customs alleged herein, Mr. Simon's rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated, causing Mr. Simon to suffer injury and harm, including lost income, lost business opportunities and related opportunity costs, loss of reputation, emotional distress and physical health consequences, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proven at trial.

LARSON
LOS ANGELES

1

2

3

**SEVENTH CAUSE OF ACTION**

*Monell* **Liability – Failure to Train**

**Against the City**

4      108.   Mr. Simon re-alleges and incorporates by reference each allegation in

5   Paragraphs 1 through 106 of this Complaint as though fully set forth herein.

6      109.   The City, through Defendant Moore and his predecessors, has failed to

7   properly train its LAPD officers, including Doe Officer Defendants, by:

8              a.   Failing to adopt, implement, and adequately train officers

9                   regarding the policies and procedures mandated by California

10                   law for using an APLR system in the context of law

11                   enforcement;

12              b.   Failing to adopt, implement, and adequately train officers on the

13                   lawful bases for initiating a "high risk" traffic stop consistent

14                   with clearly established Ninth Circuit law;

15              c.   Failing to adopt, implement, and adequately train officers to

16                   refrain from the illegal use of racial profiling by law

17                   enforcement; and

18              d.   Failing to adopt, implement, and adequately train officers to

19                   refrain from using excessive force and to refrain from disarming

20                   their firearms.

21      110.   The City knew, based on a pattern of similar occurrences, or it should

22   have been obvious to the City, that the inadequate training was likely to result in a

23   deprivation of Mr. Simon's constitutional rights under the Fourth and Fourteenth

24   Amendments.

25      111.   As a result of the City and LAPD's inadequate training, Doe Officer

26   Defendants violated Mr. Simon's constitutional rights under the Fourth and

27   Fourteenth Amendments.

28

112.   As a direct and proximate result of the City and the LAPD's failure to provide adequate training, Mr. Simon's rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated, causing Mr. Simon to suffer injury and harm, including lost income, lost business opportunities and related opportunity costs, loss of reputation, emotional distress and physical health consequences, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

**Negligence**

**Against All Defendants**

113.   Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 111 of this Complaint as though fully set forth herein.

114.   In the exercise of their law enforcement functions, Doe Officer Defendants owed a duty of care to Mr. Simon to:

    a.   Use reasonable care to prevent harm or injury to others, which includes the duty to avoid using deadly or excessive force and the duty to not to unnecessarily draw or exhibit their firearms (*see Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 629 (2013); LAPD Manual, Volume 1, Section 556.80);

    b.   Not engage in racial or identity profiling (Cal. Penal Code § 13519.4);

    c.   Not use ALPR information in a manner that would inflict harm (Cal. Civ. Code § 1798.90.54); and

    d.   Not conduct "high-risk" traffic stops based on an ALPR system's false and unverified readings unless additional circumstances justify a high-risk stop or pursuit (*see Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014); LAPD Manual, Volume 4, Section 220.60).

115.   Doe Officer Defendants—while working as police officers for the LAPD and acting within the course and scope of their duties—breached their duty of care owed to Mr. Simon by racially profiling him, initiating a "high risk" traffic stop without any lawful justification, falsely arresting Mr. Simon without probable cause, recklessly endangering Mr. Simon and his workplace by disarming their firearms, subjecting Mr. Simon to the assault of having numerous guns pointed at him as he lay defenseless on the ground, and searching his person and his company's vehicle, even though Doe Officer Defendants knew or should have known that Mr. Simon had broken no laws.

116.   As a direct and proximate cause of the Doe Officer Defendants' acts and omissions, Mr. Simon suffered and continues to suffer injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

117.   Pursuant to California Government Code § 815.2, the City is liable for Mr. Simon's injuries caused by the Doe Officer Defendants' acts and omissions. *See Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 628-29 (2013) (holding public entities are generally liable for injuries caused by the negligence of their employees acting in the scope of their employment).

118.   All of the acts and omissions of Doe Officer Defendants alleged herein were committed by them knowingly, willfully and maliciously, with the intent to harm, injure, vex, harass, and oppress Mr. Simon, with conscious disregard of his known rights and deliberate indifference to the risk of injury to Mr. Simon, therefore warranting the imposition of exemplary and punitive damages.

LARSON
LOS ANGELES

1

## **NINTH CAUSE OF ACTION**

2

### **Negligent Training, Hiring, and Supervision**

3

### **Against the City, Defendant Moore, and Supervisory Doe Defendants**

4      119.   Mr. Simon re-alleges and incorporates by reference each allegation in

5   Paragraphs 1 through 117 of this Complaint as though fully set forth herein.

6      120.   The City, the LAPD, Defendant Moore, and Supervisory Doe

7   Defendants had the authority to supervise, prohibit, control, discipline, and/or

8   regulate Doe Officer Defendants so as to prevent the acts and omissions as alleged

9   herein from occurring. Pursuant to California Government Code § 815.2, the City is

10   vicariously liable for Mr. Simon's injuries.

11      121.   The City, the LAPD, Defendant Moore, and Supervisory Doe

12   Defendants failed to exercise due care by hiring, retaining, and failing to supervise,

13   prohibit, control, discipline, and/or regulate the Doe Officer Defendants.

14      122.   As a direct and proximate cause of the City, the LAPD, Defendant

15   Moore, and the Supervisory Doe Defendants' negligent hiring, retention, and

16   supervision, control, and regulation of Doe Officer Defendants, Mr. Simon suffered

17   and continues to suffer injury to his person, including from emotional distress and

18   physical manifestations therefrom, lost income and earning capacity, expenses from

19   medical and psychological treatment, loss of reputation, litigation expenses

20   including attorneys' fees, and other compensatory damages, in an amount to be

21   proved at trial.

22      123.   All of the acts and omissions of the Defendants alleged herein were

23   committed by them knowingly, willfully, and maliciously, with the intent to harm,

24   injure, vex, harass and oppress Mr. Simon, with conscious disregard of his known

25   rights and deliberate indifference to the risk of injury to Mr. Simon, therefore

26   warranting the imposition of exemplary and punitive damages.

27

28

**TENTH CAUSE OF ACTION**

**False Arrest and False Imprisonment**

**Against All Defendants**

124.   Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 122 of this Complaint as though fully set forth herein.

125.   Doe Officer Defendants—while working as police officers for the LAPD and acting within the course and scope of their duties—intentionally deprived Mr. Simon of his liberty when Doe Officer Defendants detained Mr. Simon without probable cause and confined him to the Basecamp for an appreciable length of time through the unlawful use force, threats of force, unreasonable duress, and by enacting physical barriers into and out of the Basecamp.

126.   Furthermore, Doe Officer Defendants intentionally and without any legal justification prolonged Mr. Simon's confinement and detention by failing to promptly release him at the outset of the incident after learning from both Mr. Simon and other crewmembers that Mr. Simon—acting within the scope of his employment as a DGE crewmember—was driving a van that DGE had rented and operated to Basecamp from an offsite filming location.

127.   Rather than releasing Mr. Simon after obtaining such information, and despite the fact that such information as well as other readily observable facts negated the ALPR alert that the van Mr. Simon was driving for DGE was a stolen BMW sedan, Doe Officer Defendants unreasonably and with the intent to unlawfully confine Mr. Simon continued their "high risk" traffic stop against Mr. Simon.

128.   As a result of the Doe Officer Defendants' intentional and unlawful detention of Mr. Simon, Mr. Simon was deprived of his freedom of movement and was confined to the Basecamp for over thirty minutes.

129.   Mr. Simon did not consent to his unlawful detention. Mr. Simon also did not commit any traffic violations or other crimes while driving his company's

van from the offsite filming location to Basecamp. As such, Doe Officer Defendants had no probable cause to stop or detain Mr. Simon, and there were no facts to support a reasonable suspicion that Mr. Simon was driving a stolen vehicle, particularly after Doe Officer Defendants learned that the van was rented and operated by DGE.

130.   As a direct and proximate result of the Doe Officer Defendants' unlawful detention and confinement, Mr. Simon suffered and continues to suffer injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

131.   Pursuant to California Government Code § 815.2, the City is liable for Mr. Simon's injuries caused by the Doe Officer Defendants' acts and omissions.

132.   All of the acts and omissions of the Doe Officer Defendants alleged herein were committed by them knowingly, willfully, and maliciously, with the intent to harm, injure, vex, harass, and oppress Mr. Simon, with conscious disregard to his known rights, and with deliberate indifference to the risk of injury to Mr. Simon, therefore warranting the imposition of exemplary and punitive damages.

## ELEVENTH CAUSE OF ACTION

### Assault

### Against All Defendants

133.   Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 131 of this Complaint as though fully set forth herein.

134.   Without consent or legal justification, Doe Officer Defendants—while working as police officers for the LAPD and acting within the course and scope of their duties—wrongfully, unlawfully, and intentionally placed Mr. Simon in apprehension of death, substantial bodily injury, and other harmful contact by: (i) unnecessarily and recklessly drawing their firearms once inside the Basecamp; (ii)

holding Mr. Simon at gunpoint for over twenty minutes as he lay face down and spread eagle on the hot asphalt inside the Basecamp; (iii) yelling at the crewmembers inside the Basecamp to "get out of the line of fire" as Mr. Simon was held at gunpoint; and (iv) surrounding a defenseless and fully cooperative Mr. Simon with numerous armed police officers as a LAPD helicopter circled overhead.

135.   As a result of Doe Officer Defendants' intentional misconduct, Mr. Simon reasonably believed that he was in immediate danger of being shot by one of the at least eight armed police officers, thereby causing Mr. Simon to be legitimately terrified of the imminent possibility of death or suffering substantial bodily injury.

136.   As a direct and proximate result of the Doe Officer Defendants' intentional misconduct, Mr. Simon suffered and continues to suffer injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

137.   Pursuant to California Government Code § 815.2, the City is liable for Mr. Simon's injuries caused by Doe Officer Defendants' acts and omissions.

138.   All of the acts and omissions of the Doe Officer Defendants alleged herein were committed by them knowingly, willfully, and maliciously, with the intent to harm, injure, vex, harass, and oppress Mr. Simon, with conscious disregard to his known rights, and with deliberate indifference to the risk of injury to Mr. Simon, therefore warranting the imposition of exemplary and punitive damages.

## TWELFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### Against All Defendants

139.   Mr. Simon re-alleges and incorporates by reference each allegation in Paragraphs 1 through 137 of this Complaint as though fully set forth herein.

140.   Doe Officer Defendants—while working as police officers for the LAPD and acting within the course and scope of their duties—owed Mr. Simon, a law abiding citizen, the duties to refrain from: (i) inflicting emotional distress on Mr. Simon; (ii) inflicting physical assault and battery on Mr. Simon; (iii) treating Mr. Simon in an extremely and outrageously abusive manner; and (iv) depriving Mr. Simon of his liberty without legal justification.

141.   Doe Officer Defendants committed extreme and outrageous misconduct with the intention of causing, or with reckless disregard of the probability of causing, Mr. Simon to suffer emotional distress.

142.   Doe Officer Defendants' extreme and outrageous misconduct caused Mr. Simon severe humiliation, embarrassment, mental anguish, and emotional distress.

143.   Given the circumstances, Mr. Simon's emotional distress is completely justified. At the time of the incident, Mr. Simon was driving his company's van to the Basecamp, simply doing his job. Despite his innocence, Mr. Simon was subjected to an overwhelming show of force and was unlawfully detained in front of numerous other DGE crewmembers working inside the Basecamp.

144.   During this time, Mr. Simon's co-workers watched as the Doe Officer Defendants sped their LAPD squad cars into the Basecamp while a LAPD helicopter hovered loudly just overhead as Mr. Simon was held at gunpoint. Some of his co-workers were then told to "get out of the line of fire" while others were told not to return to the Basecamp because of the incident involving Mr. Simon.

145.   Any law abiding citizen would be humiliated and embarrassed if the police came into their place of employment, disrupted their job, recklessly endangered their co-workers by pulling out firearms, forced them to lie face down and spread eagle at gunpoint, and then double handcuffed them with no legal justification and simply because of their race.

LARSON
LOS ANGELES

146.   Moreover, Mr. Simon's job continues to entail a significant amount of driving. As a direct result of the Doe Officer Defendants' extreme and outrageous misconduct, Mr. Simon is now terrified to do his job, reasonably fearing the possibility that he could again be subjected to the same, if not worse, excessive force if another ALPR system camera affixed to a LAPD patrol car again erroneously captured a license plate and flagged the company vehicle he is driving as stolen. Mr. Simon is also justifiably fearful any time he encounters law enforcement officers, knowing that although he is doing nothing wrong, he could still be subjected to another life-threatening experience simply because of his race.

147.   As a direct and proximate result of the Defendants' extreme and outrageous conduct, Mr. Simon suffered and continues to suffer injury to his person, including from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

148.   Pursuant to California Government Code § 815.2, the City is liable for Mr. Simon's injuries caused by Doe Officer Defendants' acts and omissions.

149.   All of the acts and omissions of the Defendants alleged herein were committed by them knowingly, willfully, and maliciously, with the intent to harm, injure, vex, harass, and oppress Mr. Simon, with conscious disregard to his known rights, and with deliberate indifference to the risk of injury to Mr. Simon, therefore warranting the imposition of exemplary and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ernest Simon, Jr. prays for the following relief and judgment against Defendants:

1.   Damages of no less than $20 million, but in an amount ultimately to be proven at trial, including, but not limited to:

1          a.     Compensatory damages, including for injury to person,

2 emotional distress, medical expenses, and loss of reputation; and

3          b.     Punitive damages under 42 U.S.C § 1983 and California law in

4 an amount according to proof and which is fair, just, and reasonable.

5      2.     An award of reasonable attorneys' fees, costs, and expenses to Plaintiff

6 pursuant to 42 U.S.C. § 1988, in an amount to be proven at trial;

7      3.     For costs of suit herein incurred;

8      4.     Pre-judgment interest;

9      5.     Such other and further relief as this Court shall find just and proper.

10

11 Dated:  [INSERT DATE]        LARSON LLP

12                           By: _____

13                             Stephen G. Larson

14                             Jonathan E. Phillips

                            A. Alexander Lowder

15               Attorneys for Plaintiff Ernest Simon, Jr.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2        In accordance with Rule 38(b) of the Federal Rules of Civil Procedure,

3   Plaintiff hereby demands a trial by jury with respect to all issues and claims,

4   asserted by any party, triable of right by a jury, in the above-captioned action.

5

6   Dated:  March 17, 2022                LARSON LLP

7
                                         By:  /s/ Stephen G. Larson
8                                              Stephen G. Larson
                                               Jonathan E. Phillips
9                                              A. Alexander Lowder
10                                       Attorneys for Plaintiff Ernest Simon, Jr.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LARSON
LOS ANGELES

34
COMPLAINT